UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BENJAMIN SHOTTS,

          Plaintiff,

                                         Case No.: 2:23-cv-12647

v.                                    Hon. Gershwin A. Drain

CITY OF TAYLOR, *et al.*,

          Defendants.

_____/

## ORDER GRANTING DEFENDANT CITY OF TAYLOR'S MOTION FOR SUMMARY JUDGMENT [ECF No. 66]; DENYING DEFENDANT SAVANTE WARREN'S MOTION FOR SUMMARY JUDGMENT [ECF No. 68]; GRANTING DEFENDANTS KIM BEAUREGARD, DAVID SCHACHT, AND JEFF WITMER'S MOTION FOR SUMMARY JUDGMENT [ECF No. 69]; AND GRANTING DEFENDANT GABRIEL SHOTTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 70]

This case arises out of the officer-involved shooting of Plaintiff Benjamin Shotts on April 24, 2022 during a Taylor Auxiliary Police Department training exercise. Presently before the Court are Motions for Summary Judgment by Defendants City of Taylor, Savante Warren, Kim Beauregard, David Schacht, Jeff Witmer, and Gabriel Shotts. The Court concludes that a hearing on these motions will not aid in their disposition, and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, City of Taylor's Motion for Summary Judgment [ECF No. 66] is GRANTED, Savante Warren's Motion for

Summary Judgment [ECF No. 68] is DENIED, Kim Beauregard, David Schacht, and Jeff Witmer's Motion for Summary Judgment [ECF No. 69] is GRANTED, and Gabriel Shotts' Motion for Summary Judgment [ECF No. 70] is GRANTED.

## I.   BACKGROUND

The instant case arises out of a roleplay training exercise conducted by the Taylor Auxiliary Police Department ("TAPD") on April 24, 2022, during which Plaintiff Benjamin Shotts was shot in the abdomen by Defendant Savante Warren, a TAPD recruit.

### A. The Shooting

Plaintiff—a civilian with no law enforcement involvement—is the brother of Defendant Gabriel Shotts, who was a sergeant in the TAPD. *Id.* at PageID.2024; ECF No. 77-3, PageID.1997.[1] The TAPD is a volunteer-based law enforcement organization in the City of Taylor. ECF No. 68-2. It functions as a "standby force" that assists sworn officers with certain duties, such as vacation house checks, business checks, school checks, and anti-theft programs. *Id.* It may also assist sworn officers with emergencies when such backup is needed. *Id.*

In a civilian capacity, Plaintiff began assisting the TAPD with their field training exercises. ECF No. 77-3, PageID.1842–43. Specifically, on two occasions,

_____

[1] To avoid confusion, the Court will refer to Benjamin Shotts as "Plaintiff" and Gabriel Shotts as "Gabriel."

2

Plaintiff assisted as an actor during roleplay exercises for the TAPD. *Id.* at PageID.1840. These roleplay exercises were designed to introduce recruits to real-life scenarios they could encounter on the job and teach them about how to handle these situations. ECF No. 77-4, PageID.2059. The scenarios that the recruits and actors would play out were not predetermined. Gabriel testified that he and the other auxiliary sergeant involved in field training, Defendant David Schacht, would "come up with [the scenarios] on the fly," targeting specific weaknesses that the recruits needed to improve upon. *Id.* at PageID.2059.

On April 24, 2022, Gabriel and Schacht were running a roleplay exercise at Heritage Park in Taylor, Michigan with the TAPD recruits, including Warren. *Id.* at PageID.2084; ECF No. 77-2, PageID.1705. Plaintiff volunteered to be an actor. ECF No. 77-3, PageID.1845. According to Gabriel and Schacht, the recruits were instructed prior to beginning the roleplay scenarios that they could not have their live firearms on them while training was ongoing.[2] ECF No. 77-4, PageID.2047; ECF No. 77-5, PageID.2157. Specifically, Gabriel testified that he twice told recruits to put their real weapons inside their bags in their cars during training, and that they were only allowed to have "dummy" training pistols[3] in their holsters at all times.

[2] TAPD officers were required to carry a firearm while on duty; however, they had to purchase the firearm on their own and it had to be approved by the TAPD. ECF No. 77-2, PageID.1684.
[3] There is conflicting testimony about the nature of these training pistols. Gabriel testified that training pistols were typically yellow, blue, red, or orange, and that they

ECF No. 77-4, PageID.2047. Recruits were not allowed to holster their real weapons during downtime between scenarios. *Id.* at PageID.2068. Schacht echoed this testimony, stating that in the safety briefing before training, he and Gabriel told recruits that "they will not have a live firearm in their holster. They will have the training pistols in their holsters at all time[s]." ECF No. 77-5, PageID.2157. Eyewitness accounts from other TAPD officers that day also state that the recruits were informed not to have their real firearms on their person during the training, but Warren was switching out his fake weapon for his real weapon anyway. *See* ECF No. 66-4.

Warren's testimony diverges from these accounts. Warren claims it was "standard" that in between roleplaying scenarios, recruits were allowed to holster their real weapons, and most recruits did so. ECF No. 77-2, PageID.1726, 1755–56. Indeed, Warren claims that either Shotts or Schacht explicitly approved of the recruits holstering their real weapons between scenarios. *Id.* at PageID.1728. Warren testified that when he holstered his real weapon, he would put his training pistol in his pants pocket, and when he roleplayed in a scenario, he would put his live firearm

---

never "look anything remotely close or feel anything remotely close to an actual firearm." ECF No. 77-4, PageID.2124–25. In contrast, Warren testified that the training pistols are "exact replicas" of real firearms, and that they "feel as the same grip of a real firearm." ECF No. 77-2, PageID.1736. Notably, Warren's testimony also conflicted with itself: at first, Warren claimed that his training pistol was blue, *see id.*, but later claimed that his training pistol was yellow. *See id.* at PageID.1772.

away in his colleague's vehicle. *Id.* at PageID.1726. He also stated that he felt the need to arm himself in between exercises because, compared to where the roleplay scenes were staged, the waiting areas were "closer to the public … [and] from a safety perspective, it was not wise for us to be out in public without our actual real firearms." *Id.* at PageID.1718. Warren even commented that he felt that he and his colleagues were "sitting ducks" for an attack.[4] *Id.* at PageID.1717.

Eventually, Gabriel and Schacht asked Warren and another recruit named Graff to perform a scenario in which they were required to respond to a head-on automobile collision. ECF No. 77-2, PageID.1729; ECF No. 77-3, PageID.1863. As part of the scenario, Plaintiff acted as a passenger in one of the vehicles. ECF No. 77-3, PageID.1863. The purpose of this specific scenario was to test Warren and Graff's situational awareness. *Id.* Specifically, an actor in the vehicle opposite Plaintiff's was instructed to act belligerently, thereby drawing the attention of Warren and Graff. ECF No. 77-4, PageID.2073. Plaintiff was instructed to pretend

---

[4] Notably, Plaintiff happened to overhear Warren make the "sitting ducks" statement and stated that it made him feel uneasy. ECF No. 77-3, PageID.1854–55. That comment, in part, prompted Plaintiff to tell Gabriel: "please make sure no one shoots me today." *Id.* at PageID.1853. Plaintiff also testified that he had a sense that the training was "running too loosely" from a safety standpoint, which contributed to his unfortunately accurate sense of foreboding. *Id.* at PageID.1853–54. Gabriel testified that in general, Warren was "always a little wound up"; "very eager, very aggressive. Just very alert, over-aware, hypervigilant." ECF No. 77-4, PageID.2064–65.

to shoot at Warren and/or Graff when an opportunity presented itself, testing to see if they were prepared for an ambush despite the distraction in the other vehicle. ECF No. 77-3, PageID.1863–64. These details were not shared with Warren or Graff so as to get "natural reactions" from them. ECF No. 77-2, PageID.1729; ECF No. 77-4, PageID.2068, 2075. Notably, there were no "dummy" firearms available for Plaintiff to use in the scenario, so Gabriel disabled his own firearm in the presence of several eyewitnesses and gave it to Plaintiff for purposes of the roleplay. ECF No. 77-3, PageID.1857.

According to his instructions, Plaintiff watched for any sign that Warren or Graff were distracted. *Id.* at PageID.1867. At one point, Graff—approaching the actor who was behaving belligerently—passed by Plaintiff's vehicle to address that situation and had his back fully facing Plaintiff. *Id.* Seeing his opportunity, Plaintiff got out of the car, pretended to fire at Graff, and said "boom, you're dead." *Id.* At that point, Plaintiff believed the scenario was over, and he began walking over to where his brother was observing. *Id.* at PageID.1876. Graff also began heading back to Gabriel. *Id.* at PageID.2122. According to Gabriel, both were smiling. *Id.* at PageID.2076, 2122. Gabriel stated that he was about to "call time" and conclude the

6

exercise, noting that everyone's body language suggested that the scenario had naturally reached its conclusion. *Id.* at PageID.2122.[5]

During this time, Warren was somewhere behind Plaintiff. ECF No. 77-3, PageID.1866. Plaintiff noted that it seemed Warren was not paying attention, because Plaintiff was easily able to pretend-shoot Graff with no intervention from Warren during the actual scenario. *Id.* at PageID.1875. Indeed, Plaintiff testified that the scenario had been over for 5–15 seconds before Warren acted.[6] *Id.* at PageID.1876; *see also* ECF No. 77-5, PageID.2165 (deposition testimony of Schacht, stating that the scenario was concluded and that he was walking back to his car when he heard a gunshot go off). While Plaintiff was walking back to Gabriel for the critiques, however, Warren yelled "gun!" and shot Plaintiff in the abdomen with his real firearm. ECF No. 77-3, PageID.1878, 1908; ECF No. 77-2, PageID.1713.

Plaintiff was taken in an ambulance to the hospital for treatment of his gunshot wound. ECF No. 77-3, PageID.1905. Plaintiff received emergency blood transfusions and an exploratory laparotomy. *Id.* at PageID.1907. Doctors were

---

[5] Gabriel noted that he did not necessarily have to "call time" every time a scenario concluded, because the scenario could just end naturally. ECF No. 77-4, PageID.2122.

[6] Warren's testimony, in contrast, suggests that he noticed Plaintiff draw his firearm immediately and watched him pretend-shoot Graff, and that he acted immediately in trying to neutralize Plaintiff in the scenario. ECF No. 77-2, PageID.1733–34

unable to remove any of the bullet, which had exploded into 30 pieces inside Plaintiff. *Id.* at PageID.1908. Plaintiff states that a piece of his pelvis was shattered in this incident and that his abdominal muscles are "basically destroyed" to this day. *Id.* at PageID.1908. He still experiences excruciating pain. *Id.*

The reasons why Warren shot Plaintiff are in dispute in this matter. Warren maintains that in between scenarios, he had armed himself with his live firearm, and accidentally forgot to switch it out for his training pistol when he was called to perform the scenario with Plaintiff. ECF No. 77-2, PageID.1735–36. Warren claims that he did not realize he was holding his real firearm until he heard it make the "loud bang" when it fired a real shot, and that he never intended to shoot Plaintiff. *Id.* at PageID.1737. One of Plaintiff's theories of the case,[7] however, is that Warren was excessively vigilant and paranoid on the day in question. ECF No. 74, PageID.1376. Warren was not aware that Plaintiff would be carrying a real gun during the training scenario, so when he saw Plaintiff with the real gun, Warren perceived him as a threat and fired at him. *Id.* Moreover, Warren had extensive firearms training prior to joining the TAPD, making his claim that he could not tell the difference between a training pistol and a real firearm less credible. *Id.*[8]

_____

[7] In the alternative, Plaintiff also theorizes that even if Warren's conduct was not intentional, it was grossly negligent.

[8] Warren received his Concealed Pistol License in 2019, which required coursework involving firearm proficiency, range training, and firearm laws. ECF No. 77-2, PageID.1643. In 2020, Warren became a firearm instructor for the National Rifle

## B. The City of Taylor's Policies and Training

The TAPD is a standalone police force that is separate from the regular Taylor Police Department (TPD) and has a separate chain of command. ECF No. 77-4, PageID.2054. The TAPD communicates to the TPD through the TPD liaison, who is a sworn TPD officer. *Id.*; ECF No. 77-7, PageID.2199. At the time of the events in this case, Commander Eric Jones was the TPD liaison for the TAPD. ECF No. 77-7, PageID.2201. In addition to assisting with communications between the TPD and the TAPD, the liaison also facilitated setting up trainings and had approval and denial power over most trainings that took place. *Id.* at PageID.2205, 2209. Commander Jones testified that the training that occurred on April 24, 2022 should have been approved by him, but no one informed him about it beforehand. *Id.* at PageID.2210–11, 2214–15. Commander Jones stated that he would never have approved the April 24, 2022 training if the TAPD had asked for it. *Id.* at PageID.2250–51.

At the time of the events in this case, Gabriel had volunteered for the TAPD since 2016. ECF No. 77-4, PageID.2017. He rose through the ranks and ultimately became a sergeant for the auxiliary force in 2021. *Id.* at PageID.2024. Gabriel's duties included developing and implementing the field training program for the

---

Association, which involved taking a course, an instructor's certification test, and a shooting test. *Id.* at PageID.1648–49.

auxiliary recruits. *Id.* at PageID.2025–26. Auxiliary recruits are generally required to take a course at the Auxiliary Academy and pass a final exam. *Id.* at PageID.2020. During this time, they also do some field training "[t]o get exposure" to the job. *Id.* at PageID.2042. After graduating the Academy, the recruits become probationary officers in the Field Training Officer program, which is more involved than the field training that recruits receive during the Academy. *Id.* at PageID.2021, 2042. Gabriel helped to develop the curriculum, schedule, and agenda for field training. *Id.* at PageID.2026.

Gabriel testified that he got no additional training when he received his promotions. ECF No. 77-4, PageID.2024. He also testified that when creating the schedule for field training, he was instructed to condense the course "to be a little more rapid to get people through it." *Id.* at PageID.2026. For example, range training was condensed from four weeks to one day. *Id.* at PageID.2038. When Gabriel became a trainer, he received no training on how to properly train recruits; rather, he simply picked up behaviors from those he had observed in the past. *Id.* at PageID.2030. Gabriel stated that after passing the Academy, the TPD had little involvement with continued training of TAPD officers, aside from providing range certification trainings once every six months. *Id.* at PageID.2053. According to Gabriel, the TAPD "begged for more" training, but never received it. *Id.*

Defendant Kim Beauregard was a lieutenant in the TAPD at the time of the events in question. ECF No. 77-4, PageID.2026. Gabriel reported directly to her. *Id.* at PageID.2030. Gabriel testified that she oversaw and approved the field training program and agenda, and that he had to communicate with her about the training that took place on April 24, 2022. *Id.* at PageID.2026, 2030, 2097–98. He testified that she was in the station that day, but was not at Heritage Park where the training was occurring. *Id.* at PageID.2095. In her answers to interrogatories, Beauregard also stated that she was not at the park. ECF No. 69-7, PageID.1170. Gabriel testified that Beauregard was involved in approving the "condensed" training schedule for TAPD recruits. ECF No. 77-4, PageID.2027.

Defendant Jeff Witmer was an executive commander in the TAPD at the time Plaintiff was shot. ECF No. 69-8, PageID.1184. Gabriel testified that Beauregard reported directly to Witmer. ECF No. 77-4, PageID.2027. Gabriel also testified that he "assume[s]" that Witmer was the official who made the decision to condense the TAPD training program, although he has no personal knowledge and merely speculates as to that fact. *Id.* at PageID.2039. In his answer to interrogatories, Witmer stated that he was not at Heritage Park when the training was ongoing and that he had no idea that the training was even occurring. ECF No. 69-8, PageID.1186.

11

## II.    LAW & ANALYSIS

In this action, Plaintiff brings claims for gross negligence against Warren, Gabriel, Beauregard, and Schact; a 42 U.S.C. § 1983 claim for excessive force and violation of substantive due process against Warren; an assault and battery claim against Warren; a 42 U.S.C. § 1983 supervisory liability claim against Gabriel, Schacht, Beauregard, and Witmer; and a 42 U.S.C. § 1983 municipal liability claim against the City of Taylor. *See* ECF No. 40 (Corrected First Amended Complaint). All defendants have filed Motions for Summary Judgment, which are ripe for adjudication.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" by identifying portions of the record that demonstrate an absence of a material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must construe all reasonable inferences in favor of

the nonmoving party when conducting its analysis. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It "may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment; only the finder of fact can make such determinations." *Doe v. Snyder*, 449 F. Supp. 3d 719, 727 (E.D. Mich. 2020).

## B. Gross Negligence Under the Governmental Tort Liability Act, Mich. Comp. Laws § 691.1407

Michigan's Governmental Tort Liability Act ("GTLA") creates immunity from tort liability for governmental officers, employees, members, and volunteers under certain circumstances. Specifically, the statute provides that such individuals are "immune from tort liability for an injury to a person or damage to property" that they caused in the course of their employment or service if all the following conditions are met:

> (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2).[9]

---

[9] For purposes of his gross negligence claims, Plaintiff does not dispute that the Defendants were acting within the scope of their authority and engaged in the discharge of a governmental function. ECF No. 74, PageID.1385; ECF No. 75,

13

The statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.*(8)(a). Michigan courts have characterized this standard as requiring "almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004). "It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Id.* at 339–40. Notably, "evidence of *ordinary* negligence does not create a material question of fact concerning gross negligence." *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999) (emphasis added). "If reasonable jurors could honestly reach different conclusions regarding whether conduct constitutes gross negligence, the issue is a factual question for the jury." *Oliver v. Smith*, 810 N.W.2d 57, 62 (Mich. Ct. App. 2010).

Moreover, for purposes of "proximate cause," the Michigan Supreme Court has held that the defendant's conduct must be "the one most immediate, efficient, and direct cause preceding an injury." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009) (quoting *Robinson v. City of Detroit*, 613 N.W.2d 307, 311

---

PageID.1410; ECF No. 76, PageID.1434. Thus, the only issue is whether the Defendants' conduct constituted gross negligence.

(Mich. 2000)). "[I]t is not enough that the defendant's actions simply be 'a' proximate cause." *Tarlea*, 687 N.W.2d at 341.

### a. Savante Warren[10]

Count I of Plaintiff's complaint is gross negligence against Warren. Warren argues that Plaintiff's gross negligence claim fails as a matter of law because it is "undisputed" that Warren's use of a real gun was accidental. ECF No. 68, PageID.918. As such, his actions were not a willful disregard of safety measures or a singular disregard for risks, because he was simply unaware that he was carrying a live firearm. *Id.* Plaintiff counters that there is evidence that Warren was instructed not to holster his live weapon throughout the training session, yet did so anyway,

---

[10] The Court notes that Plaintiff's gross negligence claim against Warren is legally inconsistent with his § 1983 constitutional claim and assault and battery claims against Warren, because those two claims require intent. *See Latits v. Phillips*, 826 N.W.2d 190, 197 (Mich. Ct. App. 2012) ("[T]his Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence."); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (excessive force claim requires intent); *Daniels v. Williams*, 474 U.S. 327, 330 (1986) (due process claim requires intent). However, "a plaintiff is permitted under Fed. R. Civ. P. 8(a)(3) to plead multiple theories of recovery in the alternative, and there is no requirement that each such theory must rest upon its own independent set of allegations." *Geico Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 849 (E.D. Mich. 2018); *see* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). As such, Plaintiff is allowed to prosecute these inconsistent theories in the alternative. Plaintiff simply cannot recover under all three theories; if the jury finds that Warren's actions constitute gross negligence, Plaintiff's § 1983 and assault and battery claims necessarily must fail, and vice versa. *See, e.g.*, *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 567–68 (E.D. Tenn. 2019) (noting that a plaintiff cannot prevail on inconsistent legal theories and obtain double recovery).

which demonstrates a willful disregard for the safety of those involved in the training. ECF No. 74, PageID.1389.

In determining the issue of gross negligence, courts "consider the totality of the circumstances." *Williams v. Grand Ledge High Sch.*, No. 321261, 2015 WL 3980517, at *10 (Mich. Ct. App. June 30, 2015) (citing *Kieft v. Barr*, 214 N.W.2d 838, 839 (Mich. 1974)). The Court must analyze the evidence in the light most favorable to Plaintiff. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587. In the light most favorable to Plaintiff, the evidence suggests that Warren was instructed not once, but *twice*, that he was forbidden from holstering his real firearm during the training session.[11] Specifically, Gabriel testified that he informed recruits at the station—prior to leaving for the training at Heritage Park—that they were required to clear their weapons and put them in their bags in their cars during training. ECF No. 77-4, PageID.2047. He repeated this instruction once the recruits were at the park, telling them that a live firearm should never touch their holsters. *Id.* at PageID.2082. Schacht also testified that he and Gabriel told recruits that they cannot keep a live firearm in their holsters and that they must obey the commands of Gabriel and him. ECF No. 77-5, PageID.2157. Despite this warning, Warren armed himself with a loaded gun in between participating in scenarios. ECF No. 77-2,

---

[11] Of course, Warren claims that he was given express permission to holster his duty weapon in between scenarios. However, the Court cannot choose to believe Warren's evidence over the other evidence at the summary judgment stage.

PageID.1721. A jury could conclude that this action constituted "a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea*, 687 N.W.2d at 339.

Warren argues that he could not have been grossly negligent because he did not know he was using a real gun when he shot Plaintiff. ECF No. 68, PageID.918. However, the "willful" standard discussed in *Tarlea* "does not stand for the proposition that knowledge is a component of gross negligence." *Howard v. Pena*, No. 314873, 2014 WL 2972122, at *3 (Mich. Ct. App. July 1, 2014). Rather, it simply means "an indifference to whether harm will result [so] as to be the equivalent of a willingness that it does." *Id.* (quoting *Burnett v. City of Adrian*, 326 N.W.2d 810, 812 (Mich. 1982)) (quotation marks omitted). Here, Warren admittedly was switching between his real and fake guns during a training session in which there was a possibility that he would need to use the fake gun, and there is evidence that this was done against his superiors' orders. By putting a real firearm in his holster between scenarios and against the safety instructions of his superiors, Warren "ignored the risk" that he might bring his real firearm into a scenario, *Williams*, 2015 WL 3980517, at *10, "despite the potential consequences of his actions"—i.e., unwittingly shooting a person who was acting in the scenario. *Ewalt v. Mich. Dep't of Transp.*, No. 323212, 2016 WL 359233, at *4 (Mich. Ct. App. Jan. 26, 2016).

17

Thus, Warren's claim that there is no evidence that he ignored safety measures is simply untrue. Looking at the totality of the circumstances in the light most favorable to Plaintiff, Warren blatantly ignored the instructions given in two safety briefings and armed himself with a loaded gun during the training session. The common-sense consequence here—a gratuitous shooting—occurred because of Warren's decision to arm himself. Therefore, Warren's Motion for Summary Judgment is denied as to Count I (Gross Negligence).

### b.  Gabriel Shotts

Count II of Plaintiff's complaint is gross negligence against Gabriel. Gabriel argues that he was not grossly negligent for failing to inspect the recruits' holsters because he told them twice that they were not allowed to have their live firearms on their person during training. ECF No. 70, PageID.1223. He also argues that Warren was the proximate cause of Plaintiff's injuries, so Plaintiff cannot establish proximate cause as to Gabriel. *Id.* at PageID.1222. Plaintiff responds that Gabriel was grossly negligent because (1) he was involved in condensing the TAPD's training regimen; (2) he failed to notify Commander Jones about the training program he helped develop; and (3) he failed to take any action to ensure that real firearms were not used during the training. ECF No. 76, PageID.1438–39.

Plaintiff has not produced evidence that would permit the Court to hold Gabriel liable for gross negligence. Even though Gabriel had some involvement in

developing a condensed training regimen for the TAPD, there is no evidence in the record to suggest that by doing so, Gabriel ignored a known and substantial risk of harm. *See, e.g.*, *Zentgraf v. Gates*, No. 203375, 1998 WL 1988718, at *1 (Mich. Ct. App. Dec. 4, 1998) (granting summary judgment on gross negligence claim where there was nothing to indicate that the defendant knew the risk of harm or that his failure to anticipate the harm was a result of deliberate indifference). There is no evidence, for example, that this condensed training regimen was known to be deficient or dangerous for the recruits going through it. *See Bellinger by Bellinger v. Kram*, 904 N.W.2d 870, 873 (Mich. Ct. App. 2017) (claims that a defendant could have taken more precautions are generally insufficient to prove gross negligence, but claims that a defendant acted contrary to professionally accepted standards and sought to cover up those actions may satisfy the gross negligence standard).

In addition, there is no evidence in the record that Gabriel had any duty to communicate directly with Commander Jones. Gabriel was merely a sergeant, and he testified that he communicated through his chain of command. ECF No. 77-4, PageID.2027. The chief or commander of the TAPD were the individuals responsible for talking to the TAPD liaison, Commander Jones. *Id.* at PageID.2054. Gabriel testified that he did his part by notifying Beauregard, the TAPD lieutenant and his direct report, about the training. *Id.* at PageID.2095. As such, the fact that

Gabriel did not notify Commander Jones personally has no bearing on the issue of gross negligence—or even ordinary negligence—in this matter.

Moreover, although Gabriel arguably could have taken more precautions in ensuring that recruits were not carrying their real firearms into the training, this was not a situation where Gabriel did absolutely nothing to prevent a shooting from occurring. *See Bellinger*, 904 N.W.2d at 873 ("Generally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions are insufficient."). Rather, Gabriel informed recruits twice that they were not to have their firearms during the training and that they needed to clear their weapons and place them in their bags inside their cars. ECF No. 77-4, PageID.2047. Gabriel's lack of foresight to check each recruit's holster before beginning each scenario could be considered careless or even negligent under the circumstances, but it does not demonstrate that Gabriel *willfully* disregarded the risks, given that Gabriel attempted to address those risks with his safety briefings. *Tarlea*, 687 N.W.2d at 339 ("Simply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result.").

Finally, Plaintiff has failed to demonstrate that Gabriel's actions were the proximate cause of Plaintiff's injuries. Indeed, Plaintiff essentially admitted as much in his deposition. ECF No. 70-4, PageID.1299–300 ("[Gabriel] didn't make Savante

pull a trigger… it's not his fault that somebody did that… [U]ltimately, he didn't point a gun at me and shoot me."). A governmental actor is entitled to immunity so long as their actions were not "*the* most immediate cause of a plaintiff's injuries[.]" *Tarlea*, 687 N.W.2d at 341 (emphasis in original). No reasonable juror could conclude that Gabriel's actions were the most immediate cause of Plaintiff's injuries when Warren—who was a trained NRA firearms instructor even prior to joining the TAPD—was informed not to bring his live firearm into the training scenarios, did so anyway, and shot the fateful bullet. *Cf. Smith v. Lincoln Park Pub. Sch.*, No. 245204, 2004 WL 1124467, at *4 (Mich. Ct. App. May 20, 2004) (finding that school faculty's failure to intervene to stop the bullying of a student was not the proximate cause of her emotional harm and suicide, because the bullying was the proximate cause).

Therefore, Gabriel's Motion for Summary Judgment is granted as to Count II (Gross Negligence).

### c. Kim Beauregard

Count III of Plaintiff's complaint is gross negligence against Beauregard. Beauregard argues that there is no evidence to suggest that she was grossly negligent as it relates to the training or Plaintiff's injuries. She points out that she was not at Heritage Park on the day in question, and argues that there is no evidence that she was the proximate cause of the shooting. ECF No. 69, PageID.1094–95. Plaintiff

counters that Beauregard was involved in the decision to condense the training program and failed to bring the training to the attention of Commander Jones, who testified that he would have disapproved the training had he known about it. ECF No. 75, PageID.1414.

The very little evidence of Beauregard's involvement in this case fails to create a question of material fact on Plaintiff's gross negligence claim against her. Like Gabriel, while the evidence suggests that Beauregard had some involvement in approving a condensed training regimen, there is nothing in the record to suggest that by doing so, she ignored a known and substantial risk of harm. *See, e.g.*, *Zentgraf*, 1998 WL 1988718, at *1. As discussed in regard to the claim against Gabriel, there is no indication that this training program was so woefully deficient that by approving it, Beauregard disregarded a substantial risk that someone would be harmed during the training. *See Bellinger*, 904 N.W.2d at 873. Moreover, Plaintiff's assertion that Beauregard failed to notify Commander Jones about the proposed training is nothing more than speculation. There is no evidence regarding Beauregard's communications, or lack thereof, in the record. Indeed, it is doubtful that communicating with Commander Jones was even Beauregard's responsibility, considering that she was only a lieutenant. *See* ECF No. 77-4, PageID.2054 (deposition of Gabriel, stating that the TAPD chief or commander were responsible to talking to the liaison).

22

In any event, Plaintiff has failed to acknowledge Beauregard's argument that she was not the proximate cause of Plaintiff's injuries. No reasonable juror could conclude that Beauregard's nebulous involvement in approving the training regimen was *the* most immediate cause of the shooting, considering that Warren was *already trained* in firearm usage and was informed not to bring his live firearm into the training scenarios, did so anyway, and shot the bullet that hit Plaintiff.

Therefore, Beauregard's Motion for Summary Judgment is granted as to Count III (Gross Negligence).

### d. David Schacht

Count IV of Plaintiff's complaint is gross negligence against Schacht. Schacht argues that he was not grossly negligent, noting that he was not aware that any of the recruits had loaded firearms with them during the training session and that he had instructed recruits not to holster a live firearm during the training. Moreover, Schacht argues that he was not the proximate cause of Plaintiff's injuries. ECF No. 69, PageID.1094–95. Plaintiff responds that Schacht's failure to take efforts to ensure that the recruits were not carrying real firearms constitutes gross negligence. ECF No. 75, PageID.1414–15.

Plaintiff's gross negligence claim against Schacht fails for similar reasons as those against Beauregard and Gabriel. The evidence establishes that Schacht informed recruits that they were not to carry their real firearms in their holsters. ECF

No. 77-5, PageID.2157. Before training began, Schacht looked at all the recruits' holsters and verified that no one was carrying a firearm at that time. *Id.* at PageID.2160–61. Indeed, Schacht was not aware that anyone even brought their real firearms to the training site. *Id*. Although, in hindsight, Schacht arguably could have done *more* to ensure that a real firearm did not end up in a roleplay scenario, Schacht's efforts are far from demonstrating that he willfully disregarded safety and risks. *See Bellinger*, 904 N.W.2d at 873 ("Generally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions are insufficient."); *see also Zentgraf*, 1998 WL 1988718, at *1 (granting summary judgment on gross negligence where there was no evidence that defendant's failure to anticipate the harm was a result of a substantial lack of concern for whether injury resulted).

In any event, just as with Gabriel and Beauregard, Plaintiff has failed to address the issue of proximate cause or explain why any of Schacht's actions are the more "immediate" cause of his injuries than Warren's actions. *Cf. Smith*, 2004 WL 1124467, at *4. No reasonable juror could conclude that Schacht's alleged failures were the proximate cause when Warren is the one who fired the shot at Plaintiff.

Therefore, Schacht's Motion for Summary Judgment is granted as to Count IV (Gross Negligence).

## C. Excessive Force and Substantive Due Process Under the Fourth & Fourteenth Amendments, 42 U.S.C. § 1983

Count VI of Plaintiff's complaint is Excessive Force and Violation of Substantive Due Process under the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, as against Warren. Warren argues that this claim must be dismissed because Warren accidentally, not intentionally, shot Plaintiff during the training exercise. ECF No. 68, PageID.923–24. In response, Plaintiff cites certain circumstantial evidence that Warren's shooting may not have been accidental. Namely, Plaintiff notes that Warren was well-trained in firearms, and must have realized he was holding a real gun; Warren was paranoid; Warren fired the shot once the scenario had already concluded and Plaintiff was walking away from the scene; and Warren ignored safety briefings requiring him not to holster his live weapon. ECF No. 74, PageID.1383–84. In sum, Plaintiff's theory is that Warren panicked and perceived him as a threat, particularly considering that Plaintiff was holding a real (yet inert) gun at the time, which prompted Warren to shoot Plaintiff intentionally. *Id.* at PageID.1384.

Regarding excessive force, the Fourth Amendment holds that a citizen has a right to be free from unreasonable searches and seizures. U.S. Const. amend IV. "A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force." *Puskas v. Delaware Cnty., Ohio*, 56 F.4th 1088, 1093 (6th Cir. 2023). To

determine whether an officer's use of force is excessive, a court must consider whether the officer's actions are objectively reasonable in light of the circumstances confronting him, without regard to his underlying motivation. *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Regarding substantive due process, the Fourteenth Amendment holds that a state actor cannot "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV. Pursuant to substantive due process jurisprudence, government actions are prohibited "regardless of the fairness of the procedures used to implement them" if those actions violate certain fundamental rights, such as the right to bodily integrity. *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019) (citations omitted).

Importantly, a Fourth Amendment seizure only occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original). In other words, the seizure itself "must be willful. This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Id.* at 596. Similarly, a substantive due process violation also requires "an intentional act" on the part of the government actor. *Wilson v. Beebe*, 770 F.2d 578, 586 (6th Cir. 1985); *see also Daniels v. Williams*, 474 U.S. 327, 330 (1986) ("[T]he word 'deprive' in the Due Process Clause connote[s] more than a negligent act."). Thus, a plaintiff cannot make

26

out a claim for excessive force or substantive due process based on a defendant's purely *accidental* act.

The issue of Warren's intent is the sole basis upon which Warren seeks summary judgment on Plaintiff's Fourth and Fourteenth Amendments claim. Notably, "summary procedures are to be used sparingly where intent is a crucial factor." *Edwards v. I.D.S. Life Ins. Co.*, 77 F.R.D. 61, 62 (E.D. Tenn. 1977) (citing *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962)); *see also Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010) ("Claims involving proof of a defendant's intent seldom lend themselves to summary disposition." (cleaned up and citation omitted)).  The Sixth Circuit has "frequently held that summary judgment is inappropriate" in cases where a defendant's state of mind is in issue, because plaintiffs in such cases "must primarily rely on circumstantial evidence and reasonable inferences drawn from the defendant's conduct[.]" *Helwig v. Pennington*, 30 F. App'x 516, 518 (6th Cir. 2002) (citing *Wilson v. Seiter*, 893 F.2d 861, 866 (6th Cir. 1990)). However, summary judgment may be proper if the nonmoving party's evidence "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Helwig*, 30 F. App'x at 518–19 (citation omitted).

Warren argues that Plaintiff presented no evidence of his intent, ECF No. 80, PageID.2267, but as noted, Plaintiff has pointed to circumstantial evidence. *See Holzemer*, 621 F.3d at 526 ("[C]ircumstantial evidence may provide sufficient

27

evidence of… intent to survive summary judgment."). The question is whether Plaintiff's circumstantial evidence is sufficient to create a genuine question of fact on the issue.[12]

Considering the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff's circumstantial evidence has crossed the threshold into a genuine dispute of material fact on the issue of intent, particularly considering that summary disposition should be used sparingly when intent is the crucial factor. There is evidence in the record indicating that Warren was unusually paranoid for an auxiliary police recruit. Gabriel testified that Warren was "always a little wound up," "very eager," "very aggressive," "very alert, over-aware, [and] hypervigilant." ECF No. 77-4, PageID.2064–65. Plaintiff testified that he overheard Warren talking about how he felt as if the recruits were "sitting ducks for an attack," a comment that unnerved him. ECF No. 77-3, PageID.1854. A reasonable jury could find these facts indicative of the state of mind that Warren was in, which was bizarre in context and could have predisposed Warren to using his real weapon under the circumstances.

---

[12] Warren heavily relies on *Gorman v. Sharp*, a Fifth Circuit case in which a firearms instructor forgot to replace his real firearm for a fake firearm during a training, and accidentally shot his co-instructor in the chest, killing him. 892 F.3d 172, 173–74 (5th Cir. 2018). The Fifth Circuit granted summary judgment to the defendant firearms instructor, noting that an accidental shooting is not cognizable under the Fourth Amendment. *Id.* at 175. This case does little to aid Warren's argument, however, because the accidental nature of the shooting in *Gorman* was undisputed, and therefore the court did not evaluate any evidence on that issue. *See id.* Here, Plaintiff opposes Warren's argument that the shooting was accidental.

Warren's apparent concern about being attacked is compounded by the fact that Warren disregarded two safety briefings which informed the recruits that they must "have the training pistols in their holsters at all time[s]." ECF No. 77-5, PageID.2157; *see Gray by Gray v. Kern*, 702 F. App'x 132, 140 (4th Cir. 2017) (finding a genuine question of fact whether the officer accidentally or intentionally shot someone during a training session, in part, where the officer "carried his live service weapon despite the known danger of and prohibition against being so armed."). Warren's refusal to follow safety orders along with his demonstrated concern about being attacked supports an inference that Warren could have been quick to pull out his real weapon intentionally. Moreover, if the jury believes Gabriel and Schacht that Warren was never given permission to holster his real weapon during the training session, Warren's "false exculpatory account"—that his superiors agreed to allow him to arm himself between scenarios—is more evidence of intent. *See Gray by Gray*, 702 F. App'x at 140 (finding a genuine question of fact whether the officer accidentally or intentionally shot someone during a training session, in part, where the officer "concocted [a] false exculpatory account of being armed with his live service weapon by agreement with [another officer] out of concern that the… campus was unsafe[.]").

Moreover, Warren had received firearms training before ever joining the TAPD. Warren received his CPL in 2019, which required coursework and range

training. ECF No. 77-2, PageID.1643–44. A year later, Warren became a National Rifle Association ("NRA") instructor, which also required coursework and range training. *Id.* at PageID.1648–49. As an NRA instructor, Warren has taught CPL and home defense courses. *Id.* at PageID.1650. Even before receiving his CPL in 2019, Warren owned two handguns. *Id.* at PageID.1647. If a jury concludes that Warren is amply familiar with firearms and firearms safety, it may find Warren's claim that he did not realize he was holding his real, loaded firearm incredible. There is evidence in the record that the training pistols do not "look anything remotely close or feel anything remotely close to an actual firearm." ECF No. 77-4, PageID.2125.[13] Indeed, Warren testified in his deposition that his training pistol was yellow[14] and its trigger was stationary and inoperable, a far cry from a real Glock handgun. ECF No. 77-2, PageID.1736, 1772.

Finally, there is evidence in the record to suggest that after Plaintiff pretend-shot Graff with Gabriel's real (but inert) weapon, the scenario had palpably concluded for at least 5–15 seconds; Plaintiff no longer had his firearm up, and he and Graff were walking over to where Gabriel was standing. ECF No. 77-4,

---

[13] Although Warren contests this assertion, the Court cannot make credibility assessments at the summary judgment stage.

[14] At another point in the deposition, Warren testified that his training pistol was blue. ECF No. 77-2, PageID.1736. The reason for the discrepancy is not clear.

PageID.2074. If a jury believes this testimony, it may discredit any claim that Warren still believed the scenario to be ongoing.

In sum, there are circumstantial facts in this case that could convince a jury that Warren's testimony is not credible and that Warren did shoot his real gun intentionally. At summary judgment, the Court is required to view the "inferences that can be drawn from… facts" in the light most favorable to Plaintiff. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Moreover, the Court is not permitted to weigh the evidence. *Snyder*, 449 F. Supp. 3d at 727. Ultimately, much of the facts in this case are contested between the parties and the final disposition will rely on credibility determinations. Especially as it relates to the issue of intent, the Court cannot make "a credibility assessment drawn from a cold record." *Manson v. Nathan*, No. 17-12256, 2018 WL 705154, at *2 (E.D. Mich. Feb. 5, 2018) (citations omitted). Therefore, Warren's Motion for Summary Judgment is denied as to Count VI (Excessive Force & Due Process).

### D. Assault & Battery

Count V of Plaintiff's complaint is a claim for assault and battery against Warren. Warren argues that there is no evidence that he intentionally rather than accidentally shot Plaintiff, so the assault and battery claim—which requires intent—fails as a matter of law. ECF No. 68, PageID.921. Warren also argues that, in any

event, he is entitled to governmental immunity on the assault and battery claim. *Id.* at PageID.922.

An assault is defined as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 116, 119 (Mich. Ct. App. 1991) (citing *Tinkler v. Richter*, 295 N.W.2d 201, 203 (Mich. 1940)). A battery is defined as a "willful or intentional touching of another person against that person's will," *Moher v. United States*, 875 F. Supp. 2d 739, 756 (W.D. Mich. 2012) (citations omitted), which may include when the person is touched by an object that the tortfeasor put in motion. *Mitchell v. Daly*, 350 N.W.2d 772, 777 (Mich. Ct. App. 1984) (citation omitted).

For intentional torts like assault and battery, statutory governmental immunity does not apply. *See* Mich. Comp. Laws § 691.1407(3). Rather, courts must apply the common law of intentional torts as it existed before July 7, 1986 in determining whether a government actor has immunity. *Id.* In *Odom v. Wayne County*, the Michigan Supreme Court clarified that a government actor enjoys immunity for an intentional tort where: (1) the acts were taken during the course of employment and the actor was acting, or reasonably believed he was acting, within the scope of his authority; (2) the actor was acting in good faith; and (3) the acts were discretionary,

32

rather than ministerial. 760 N.W.2d 217, 224–26 (Mich. 2008). Notably, governmental immunity under Michigan law is "'subjective in nature': It 'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (quoting *Odom*, 760 N.W.2d at 229).

First, Warren's argument that there is no evidence of intent has already been foreclosed by the Court's decision as it relates to Plaintiff's § 1983 claim. For the reasons discussed as to Plaintiff's § 1983 claim, Plaintiff has presented circumstantial evidence of intent that is sufficient to create a jury question. *See Acklin v. City of Inkster*, 93 F. Supp. 3d 778, 799 (E.D. Mich. 2015) (citing *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010)) (noting that a state-law assault and battery claim against a police officer is analogous to a § 1983 excessive force claim).[15]

---

[15] Warren notes that Plaintiff failed to address the assault and battery claim in his response to Warren's Motion for Summary Judgment, and argues that Plaintiff's failure to oppose the dismissal should result in summary judgment in Warren's favor. If a party fails to properly address another party's assertion of fact, a court can grant summary judgment if the motion and the undisputed evidence shows the movant is entitled to it. Fed. R. Civ. P. 56(e)(3). In this case, however, there is substantial overlap between Plaintiff's § 1983 claim and his assault and battery claim—indeed, they are predicated on the same issue (intent)—and the Court has already determined that Plaintiff's § 1983 claim proceeds. *Acklin*, 93 F. Supp. 3d at 799. As such, Warren's motion and the evidence in the record here do not show that he is entitled to summary judgment on assault and battery either.

Second, as it relates to Warren's argument for governmental immunity, Warren argues that he acted in 'good faith,' sufficient to satisfy the good faith prong of the governmental immunity test. In support of this proposition, Warren cites *Veldman v. City of Grand Rapids*, which stated that a court can intervene in the decisions of city commissioners if those city commissioners acted without good faith, which was defined as "malicious intent, capricious action, or corrupt conduct." 265 N.W. 790, 794 (Mich. 1936). Warren asserts that there is no evidence that he was malicious, capricious, or corrupt.

A more recent and thorough definition of "good faith," which is tailored specifically to governmental immunity, can be found in *Odom*. There, the Michigan Supreme Court explained that a governmental actor lacks good faith where he acts maliciously or with wanton or reckless disregard for the rights of another. 760 N.W.2d at 225. An actor also lacks good faith where his conduct "shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Id.* After considering Warren's refusal to follow orders to never holster a live firearm, and the other circumstantial evidence regarding his mindset on the day in question, a jury could determine that Warren was indifferent to whether harm could have resulted to Plaintiff. *See Acklin*, 93 F. Supp. 3d at 800 (denying governmental immunity to officers on assault and battery claim where there was a question of fact whether the force used was excessive). Because a jury could conclude that Warren

34

acted wantonly or recklessly, Warren is not entitled to immunity and Plaintiff's assault and battery claim survives summary judgment. Therefore, Warren's Motion for Summary Judgment is denied as to Count V (Assault & Battery).

### E. Supervisory Liability Under 42 U.S.C. § 1983

Count VII of Plaintiff's complaint alleges supervisory liability under 42 U.S.C. § 1983 against Shotts, Witmer, Beauregard, and Schacht. These "Supervisory Defendants" argue that Plaintiff has failed to create a genuine dispute of material fact on the issue of supervisory liability because there is nothing in the record demonstrating their participation, authorization, or acquiescence in Warren's conduct. Plaintiff counters that the Supervisory Defendants' involvement in condensing the TAPD training, and the "shoddy" nature of the training itself, constitutes their "implicit" authorization of Warren's conduct.

"It is well-settled that '[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (citation omitted). However, a plaintiff may succeed on a supervisory liability theory where he can prove that the supervisor's actively unconstitutional conduct was the actual and proximate cause of his injuries. *See Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Crawford v. Tilley*, 15 F.4th 752, 766 (6th Cir. 2021). This behavior need not be "'active' in the sense that the supervisor must have physically

put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross*, 818 F.3d at 242. Rather, there must be a showing that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 790 (6th Cir. 2012) (citation omitted); *see also Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)) ("[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.").

Importantly, "a defendant may not be found to bear supervisory liability based on mere negligence[,]" *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 866 (6th Cir. 2020), nor on a "mere failure to act." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted). "[I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties." *Doe ex rel. Doe*, 296 F.3d at 439. A plaintiff must prove that the supervisor "did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory*, 444 F.3d at 751.

36

Based on these legal principles, Plaintiff has failed to create a genuine issue of material fact as to the liability of any Supervisory Defendant. Plaintiff claims that the training that TAPD recruits received was "shoddy," "conducted by an inexperienced trainer [Gabriel]," and "condensed." ECF No. 75, PageID.1409; ECF No. 76, PageID.1433. Because these Supervisory Defendants were involved in formulating or approving this training regimen,[16] Plaintiff alleges that they implicitly authorized Warren's unconstitutional conduct. Ultimately, however, Plaintiff is simply asking the Court to hold the supervisory Defendants liable for conduct that could be considered "sloppy, reckless[,] or negligent," which is insufficient for supervisory liability purposes. *Doe ex rel. Doe*, 296 F.3d at 439; *Koch v. Dep't of Nat. Res.*, 858 F. App'x 832, 840 (6th Cir. 2021) (a "bare allegation" that the defendants encouraged and supported unconstitutional conduct "by failing to train and discipline is not enough[.]"); *Comer v. Shrum*, No. 4:18-cv-58, 2021 WL 12096673, at *5 (E.D. Tenn. June 25, 2021) (stating that plaintiff's allegation that the supervisors knew that their subordinate lacked training was "too tenuous to establish individual supervisory liability under § 1983.").

---

[16] Notably, there is no actual evidence demonstrating Witmer's involvement in the training. Gabriel speculated that, because he was in the chain of command, Witmer must have been involved in approving it. Gabriel's speculation is not actual evidence of Witmer's involvement. Regardless, even if we assume Witmer was involved in developing the training program as Plaintiff alleges, it would not be enough to impute supervisory liability on him.

Indeed, it is Warren's "alleged unreasonable use of… force, not his lack of training, that give[s] rise to Plaintiff's § 1983 claims." *Comer*, 2021 WL 12096673, at *5. It must be remembered that Plaintiff's *constitutional* claim against Warren relies on alleged *intentional* conduct. As such, Plaintiff needed to provide evidence that the Supervisory Defendants authorized, approved, or acquiesced in *Warren firing an intentional shot during a training scenario*, not merely that they created a sloppy environment where a recruit could make a haphazard mistake with his real firearm. *See Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (stating that a supervisor is not liable unless he either encouraged or participated in the "*specific incident* of misconduct."). But the record is devoid of facts that indicate that the Supervisory Defendants authorized, approved, or acquiesced in such conduct. Warren was already trained in firearms; there was nothing to put the Supervisory Defendants on notice that Warren might be capable of firing a real shot in a panic; there is no history of similar mishaps occurring during training scenarios in the past that the Supervisory Defendants ignored; and there is no evidence that recruits were lacking training on when it is reasonable to deploy potentially deadly force.

Therefore, Gabriel's, Witmer's, Beauregard's, and Schacht's Motions for Summary Judgment are granted as to Count VII (Supervisory Liability).

### F. Municipal Liability Under 42 U.S.C. § 1983 – Failure to Train

Count VIII of Plaintiff's complaint is a municipal liability claim against the City of Taylor based on failure to train. The City argues that Plaintiff has not proven what specific supervision or training was lacking that could be considered the moving force behind Plaintiff's injury. The City claims that Warren simply failed to follow the City's policies on the day in question, not that the City was lacking policies to prevent what occurred. ECF No. 78, PageID.2254. Plaintiff argues that the City's training of the TAPD was deficient, noting that the actual Taylor Police Department was unaware of what the TAPD was doing for training, that Gabriel was not trained on how to train recruits and had no formal law enforcement training himself, and that the TAPD had condensed its range training from four weeks to one day. ECF No. 73, PageID.1363.

Under 42 U.S.C. § 1983, a municipality may be found liable "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)) (emphasis in original). As such, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 691, 694). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61.

A local government's failure to train its staff may constitute an official municipal policy sufficient to sustain an action under § 1983. *See id.* ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."). To prevail on such a theory, the plaintiff must prove three elements: (1) the training program is inadequate to the tasks that the officers must perform, (2) the inadequacy is the result of the municipality's deliberate indifference, and (3) the inadequacy is closely related to or actually caused the plaintiff's injury. *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (citation omitted).

Notably, deliberate indifference is a "stringent standard of fault" which requires proof that the municipality ignored a known or obvious consequence of its actions. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (citation omitted). However, in narrow circumstances, a plaintiff may prevail on a failure to train claim based on a single violation of federal rights if he shows that the municipality "failed to train its

40

employees to handle recurring situations presenting an obvious potential for such violation." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 562–63 (6th Cir. 2011) (citation omitted). This requires a plaintiff to show "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 942–43 (M.D. Tenn. 2012) (quoting *Harvey*, 453 F. App'x at 567).

Plaintiff's evidence and arguments fail to meet the "high, nearly insurmountable, threshold in arguing that the single instance suffices to support a failure-to-train claim." *Anderson v. Jones*, 440 F. Supp. 3d 819, 839 (S.D. Ohio 2020). First, Plaintiff complains that the TAPD's training regimen had been "condensed" and that TAPD recruits only received one day of range training. But "[w]hether that training was the best and most comprehensive available has no bearing on [a plaintiff's] failure to train claim." *Lewis v. City of Irvine, Ky.*, 899 F.2d 451, 455 (6th Cir. 1990). It does not suffice to show merely that "an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *City of Canton, Ohio*, 489 U.S. at 391. It is undisputed that the City of Taylor provided "*some* training" to its recruits—Academy training, field training, and even range training, however shortened. *Harvey*, 453 F. App'x at 567. In the absence of a history

41

of repeated constitutional violations, Plaintiff has failed to make a showing that it was *obvious* that without more training, "it was so highly predictable" that someone would be shot during a TAPD training session "as to amount to conscious disregard for citizens' rights." *Id.*; *see also Chowning v. Hardin Cnty., Ky.*, No. 3:19-CV-509-CRS, 2022 WL 4636146, at *11 (W.D. Ky. Sept. 30, 2022) (granting summary judgment to county because the officers received some training).

In any event, even if the City's shortened training of the TAPD recruits was so deficient as to constitute "deliberate indifference," Plaintiff has not established that it is closely related to or the actual cause of his injuries. When it comes to establishing causation, the relevant question is "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *City of Canton, Ohio*, 489 U.S. at 391. Warren testified that during his CPL course, he had been trained never to point a firearm at someone unless engaging in a lethal threat. ECF No. 77-2, PageID.1651–52. In general, Warren was well trained in firearm usage and was even an NRA instructor. Plaintiff has not even begun to answer the question of whether the harm in this case would have been avoided if TAPD recruits had better training from the City of Taylor, given that Warren himself was already trained on firearm use. *See, e.g.*, *Plinton*, 540 F.3d at 464 (granting summary judgment to county where the officer was already trained and experienced before joining the county police force); *Gambrel v. Knox*

42

*Cnty., Ky.*, 25 F.4th 391, 411 (6th Cir. 2022) (stating that courts have "regularly relied" on an officer's previous academy training to reject claims against municipalities that offer little additional training to police officers once they are on the force).

Second, Plaintiff complains that Commander Jones, the TPD liaison for the TAPD, had no idea that the TAPD was conducting the specific training on April 24, 2022. In addressing a failure-to-train claim, a court must "distinguish between instances where the violation occurred due to the actor's lack of adequate training… as opposed to the actor's own failure *to follow* the training that he or she received in a given instance[.]" *Anderson*, 440 F. Supp. 3d at 839 (emphasis in original). Commander Jones and Gabriel testified that there was a chain of command that had to be followed when getting permission to perform training exercises. ECF No. 77-4, PageID.2115; ECF No. 77-7, PageID.2214. Commander Jones stated that the TAPD *should have* requested his permission to conduct the roleplay scenario training, but somewhere along the way that policy was not followed, because he never received word about the training. As such, Commander Jones' lack of knowledge about the training is not a result of a failure to train, but instead a result of someone disregarding the established chain of command or failing to communicate as required. Simply because the City's policy was "negligently

administered" on this occasion does not suffice to show that the City was deliberately indifferent to Plaintiff's rights. *City of Canton, Ohio*, 489 U.S. at 391.

Third, Plaintiff complains that Gabriel was not trained on how to train new recruits, yet he was tasked with developing their curriculum and training agenda. Plaintiff has not explained why this alleged failure to train Gabriel made it "almost inevitable" or "substantially certain" that someone would be shot during a TAPD training exercise, such that the City could be considered deliberately indifferent to an obvious risk of someone being shot. *Okolo*, 892 F. Supp. 2d at 942–43. Indeed, Plaintiff only vaguely references Gabriel's lack of training without connecting it to any training that he believes Gabriel *should have* received from the City in order to perform his role as a TAPD trainer and to protect the constitutional rights of those involved in the TAPD training exercises. *See Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 415 (6th Cir. 2023) (granting county summary judgment on failure-to-train claim where the plaintiff failed to explain how the officers' training was deficient, or how such training would have made the possibility for a constitutional violation obvious).

Moreover, even if the failure to adequately train Gabriel could be considered "deliberate indifference," Plaintiff has not established the requisite causation required to prevail on this theory. As the Court discussed in relation to Plaintiff's argument about the TAPD's shortened training schedule, the evidence establishes

that Warren was already trained on firearms safety prior to joining the TAPD. Moreover, although Warren disputes that he was not allowed to holster his duty weapon in between scenarios, Warren admits that Gabriel and Schacht performed safety briefings instructing the recruits not to use their real weapons during the scenarios. ECF No. 77-2, PageID.1716. Plaintiff does not address whether the harm in this case would have actually been avoided if *Gabriel* had more training, given that Warren himself was already trained on firearm safety and knew not to bring his real weapon into the scenarios.

Therefore, the City of Taylor's Motion for Summary Judgment is granted, and Count VIII (Municipal Liability) is dismissed.

### III.   CONCLUSION

For the foregoing reasons, IT IS ORDERED that:

1. The City of Taylor's Motion for Summary Judgment [ECF No. 66] is **GRANTED,** and the City of Taylor is hereby **DISMISSED;**

2. Savante Warren's Motion for Summary Judgment [ECF No. 68] is **DENIED;**

3. Jeff Witmer, Kim Beauregard, and David Schacht's Motion for Summary Judgment [ECF No. 69] is **GRANTED,** and Jeff Witmer, Kim Beauregard, and David Schacht are hereby **DISMISSED;**

4. Gabriel Shotts' Motion for Summary Judgment [ECF No. 70] is

**GRANTED,** and Gabriel Shotts is hereby **DISMISSED.**

**SO ORDERED.**

Dated:  December 12, 2025                         /s/Gershwin A. Drain
                                                 GERSHWIN A. DRAIN
                                                 United States District Judge